## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| CHRISTIAN ROBBINS; GREG NOYES; EVA NOYES; and SHANA SMITH, <br><br> *Plaintiffs*, <br><br> v. <br><br> TENNESSEE HOUSING DEVLEOPMENT AGENCY (THDA); RALPH PERREY, in his official capacity as Executive Director of THDA; LINDSAY HALL, in her official capacity as Chief Operating Officer of Single Family Programs at THDA; RICK NEAL, in his official capacity as Chair of THDA's Board of Directors; STEPHEN DIXON, in his official capacity as Vice Chair of THDA's Board of Directors; JACKY AKHARI, in her official capacity as a member of THDA's Board of Directors; JIM BRYSON, in his official capacity as a member of THDA's Board of Directors; TRE HARGETT, in his official capacity as a member of THDA's Board of Directors; MAEGHAN JONES, in her official capacity as member of THDA's Board of Directors; DAVID LILLARD, in his official capacity as a member of THDA's Board of Directors; MICHAEL A. MILLER, in his official capacity as a member of THDA's Board of Directors; ROB MITCHELL, in his official capacity as a member of THDA's Board of Directors; JASON E. MUMPOWER, in his official capacity as a member of THDA's Board of Directors; CHRISTINE RHEA, in her official capacity as a member of THDA's Board of Directors; EVA ROMERO, in her official capacity as a member of THDA's Board of Directors; and DAN SPRINGER, in his official capacity as a member of THDA's Board of Directors, <br><br> *Defendants*. | Civil Action No. 1:24-cv-1229 <br><br> **Complaint – Class Action** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Christian Robbins, Greg Noyes, Eva Noyes, and Shana Smith, bring this action for damages and declaratory and injunctive relief on behalf of themselves and a Class of others who were similarly discriminated against based on the color of their skin. Plaintiffs bring this case against the following Defendants, who are responsible for carrying out an unconstitutional, race-based social agenda: Tennessee Housing Development Agency (THDA); Ralph Perrey, in his official capacity as Executive Director of THDA; Lindsay Hall, in her official capacity as Chief Operating Officer of Single Family Programs at THDA; Rick Neal, in his official capacity as Chair of THDA's Board of Directors; Stephen Dixon, in his official capacity as Vice Chair of THDA's Board of Directors; Jacky Akhari, in her official capacity as a member of THDA's Board of Directors; Jim Bryson, in his official capacity as a member of THDA's Board of Directors; Tre Hargett, in his official capacity as a member of THDA's Board of Directors; Maeghan Jones, in her official capacity as member of THDA's Board of Directors; David Lillard, in his official capacity as a member of THDA's Board of Directors; Michael A. Miller, in his official capacity as a member of THDA's Board of Directors; Rob Mitchell, in his official capacity as a member of THDA's Board of Directors; Jason E. Mumpower, in his official capacity as a member of THDA's Board of Directors; Christine Rhea, in her official capacity as a member of THDA's Board of Directors; Eva Romero, in her official capacity as a member of THDA's Board of Directors; and Dan Springer, in his official capacity as a member of THDA's Board of Directors (collectively "THDA").

THDA developed, marketed, and administered its Tennessee Homeowner Assistance Fund program on the basis of race. THDA discriminated and continues to discriminate in the provision of COVID-19 relief funds, violating Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. For the reasons set forth in this Complaint, Plaintiffs and the proposed Class are entitled to damages, a declaratory judgment, and injunctive relief.

## INTRODUCTION

1.      THDA has systematically discriminated and continues to discriminate against white homeowners when providing COVID-19 relief. As part of its Tennessee Homeowner Assistance Fund program, THDA has prioritized "socially disadvantaged individuals" in everything from the development and marketing of its program to approving applications. THDA impermissibly identified "socially disadvantaged individuals" based on their race.

2.      In designing, marketing, and administering its Tennessee Homeowner Assistance Fund program, THDA explicitly defined social disadvantage based on identification "as a minority race or ethnicity." THDA, TNHAF Homeowner Assistance Fund at 6, https://perma.cc/GQE5-C7BE ("Plan Narrative"). Thus, under THDA's program, "[i]ndividuals that identify as members of these groups"—that is, "American Indian/Alaska Native," "Asian," "Black or African American," "Native Hawaiian/Pacific Islander," and "Hispanic or Latino"—"in their application" are "considered socially disadvantaged." *Id.*

3.      THDA used this race-based definition of socially disadvantaged individual to prioritize homeowners of THDA's preferred racial and ethnic groups over white homeowners. THDA used that definition to discriminate in how it marketed its program (by targeting notifications about the program to its preferred racial groups) and in assisting applicants and distributing funds to them (by prioritizing assistance to homeowners of its preferred racial and ethnic groups over white applicants).

4.      As a result of THDA's racial discrimination, white homeowners (including Plaintiffs) who struggled with the economic consequences of the COVID-19 pandemic lost out on financial assistance they needed to pay their mortgages. For example, Plaintiff Christian Robbins lost significant income as he was unable to work at his family's restaurants during the pandemic, which caused him to get behind on his mortgage. But due to THDA's discriminatory marketing

and outreach about its Tennessee Homeowner Assistance Fund program, he never heard about the program. Similarly, Greg and Eva Noyes lost significant income when Greg's hours were cut at his cabinet-manufacturing factory, which caused them to get behind on their mortgage. But when Eva called THDA to inquire about the Tennessee Homeowner Assistance Fund, she was asked for her race and ethnicity and then told without explanation that she and Greg did not qualify—despite their clear eligibility for the program. Finally, Shana Smith lost significant income and had difficulty finding a job after the pandemic started and got behind on her mortgage. Shana applied for mortgage assistance through the Tennessee Homeowner Assistance Fund and provided all the information THDA requested. But THDA denied her application despite her clear eligibility for relief. Plaintiffs Robbins, Greg and Eva Noyes, and Smith—and many other Tennessee homeowners like them—needlessly suffered financial hardships because of THDA's race-based social agenda.

5.      There is no justification for THDA's racial discrimination. THDA could have administered its program in a race-neutral way. Instead, it discriminated (and continues to discriminate) against white homeowners in favor of homeowners from preferred racial groups. But COVID-19 did not discriminate. THDA homeowners of all races needed and continue to need assistance.

6.      THDA's racial discrimination is plainly unlawful. The Supreme Court has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). When the government treats citizens differently based on race, "it demeans the dignity and worth of a person to be judged by ancestry

instead of by his or her own merit and essential qualities." *Id.* (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)).

7.     Plaintiffs and the Class are entitled to damages and declaratory and injunctive relief under Title VI and the Equal Protection Clause.

## JURISDICTION & VENUE

8.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

9.     This Court has personal jurisdiction over Defendants because they reside in and/or conduct a substantial proportion of their official business in Tennessee.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) and this Division under LR 3.3(b) because at least one Defendant is a resident of this District and Division and all Defendants are residents of Tennessee, at least one Plaintiff is a resident of this District and Division, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Division. Venue is also proper in this District under 28 U.S.C. § 1391(c)(2) because Defendant THDA is an entity with the capacity to sue and be sued, T.C.A. § 13-23-115(24), and is subject to the Court's personal jurisdiction with respect to the civil action in question.

## PARTIES

11.     Plaintiff Christian Robbins is a resident of Tennessee.

12.     Plaintiff Greg Noyes is a resident of Tennessee.

13.     Plaintiff Eva Noyes is a resident of Tennessee.

14.     Plaintiff Shana Smith is a resident of Tennessee.

15.     Defendant Tennessee Housing Development Agency (THDA) is "a body, politic and corporate" and "political subdivision and instrumentality of the state," T.C.A. § 13-23-104, that "was created by the General Assembly in 1973 as the state's housing finance agency." THDA, About Us, https://perma.cc/GQE5-C7BE ("THDA, About Us"). THDA submitted Tennessee's

Homeowner Assistance Fund plan to U.S. Department of the Treasury, and "[w]ith approval provided by the office of the Governor, the Tennessee Housing Development Agency (THDA) [administers] the HAF funds to those eligible homeowners experiencing a financial hardship related to the Covid-19 pandemic." Plan Narrative at 2. In sum, THDA developed, marketed, and administers the Tennessee Homeowner Assistance Fund program.

16.    Defendant Ralph Perrey is the Executive Director of THDA. THDA, About Us. As Executive Director, Defendant Perry is responsible for the operation of THDA and the development, implementation, and administration of its programs, including the Tennessee Homeowner Assistance Fund program. Defendant Perrey signed and certified THDA's Tennessee Homeowner Assistance Fund plan submission to the U.S. Department of the Treasury. THDA, U.S. Dep't of the Treasury, Homeowner Assistance Fund Plan HAFP-0079, at 22 (December 2021), https://perma.cc/2ELZ-GUW9 ("Tennessee Plan Submission"). Defendant Perry is sued in his official capacity.

17.    Defendant Lindsay Hall is the Chief Operating Officer of Single Family Programs at THDA. As Chief Operating Officer of Single Family Programs, Defendant Hall oversees the development, implementation, and administration of THDA's programs, including the Tennessee Homeowner Assistance Fund program. Defendant Hall was listed as the Primary Contact on THDA's submission to the U.S. Department of the Treasury. *Id.* at 20. Defendant Hall is sued in her official capacity.

18.    Rick Neal is the Chair of THDA's Board of Directors. THDA, Board Members, https://perma.cc/3WFT-CKG2. As the Chair of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Neal is sued in his official capacity.

19.    Defendant Stephen Dixon is the Vice Chair of THDA's Board of Directors. *Id.* As the Vice-Chair of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Dixon is sued in his official capacity.

20.    Defendant Jacky Akhari is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Akhari is sued in her official capacity.

21.    Defendant Jim Bryson is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Bryson is sued in his official capacity.

22.    Defendant Tre Hargett is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Hargett is sued in his official capacity.

23.    Defendant Maeghan Jones is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Jones is sued in her official capacity.

24.    Defendant David Lillard is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing

programs, including the Tennessee Homeowner Assistance Fund program. Defendant Lillard is sued in his official capacity.

25.     Defendant Michael A. Miller is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Miller is sued in his official capacity.

26.     Defendant Rob Mitchell is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Mitchell is sued in his official capacity.

27.     Defendant Jason E. Mumpower is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Mumpower is sued in his official capacity.

28.     Defendant Christine Rhea is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Rhea is sued in her official capacity.

29.     Defendant Eva Romero is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, she oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Romero is sued in her official capacity.

30.     Defendant Dan Springer is a member of THDA's Board of Directors. *Id.* As a member of THDA's Board of Directors, he oversees THDA and its implementation of its housing programs, including the Tennessee Homeowner Assistance Fund program. Defendant Springer is sued in her official capacity.

## LEGAL FRAMEWORK

31.     Federal law prohibits government officials from discriminating on the basis of race in the administration of government programs.

32.     As the Supreme Court recently explained, the "'core purpose' of the Equal Protection Clause [is] 'do[ing] away with all governmentally imposed discrimination based on race.'" *SFFA*, 600 U.S. at 206 (citation omitted). And "[e]liminating racial discrimination means eliminating *all of it*." *Id.* (emphasis added); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024) ("*Fearless Fund Mgmt.*") (describing "race discrimination as 'subtle, pervasive, and essentially irremediable'" and noting that the burden of complying with Civil Rights statutes "pales in comparison to the interest in rooting out race discrimination in all its forms").

33.     Title VI codifies that core purpose of equal protection, providing that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

34.     Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n. 23 (2003)).

35.     Under both Title VI and the Equal Protection Clause, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

36.     Strict scrutiny is the most "daunting" standard of review. *SFFA*, 600 U.S. at 206. And for good reason—"racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (quoting *Gratz*, 539 U.S. at 270). That is why, under strict scrutiny, "[g]overnment policies that classify people by race are presumptively invalid," and "[t]o overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest." *Holman v. Vilsack*, 2021 WL 2877915, at *6 (W.D. Tenn. July 8, 2021) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)); *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 926 (11th Cir. 1997) ("The essence of the 'narrowly tailored' inquiry is the notion that explicitly racial preferences . . . must be only a 'last resort' option." (quoting *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993))). Under strict scrutiny, courts ask (1) "whether the racial classification is used to 'further compelling governmental interests'" and, if so, (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted). But the Supreme Court has identified "only two compelling interests that permit resort to race-based government action"—"remediating specific, identified instances of past discrimination that violated the Constitution or a statute" and "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Outside of these "rare" and "most extraordinary case[s]," the Court has held that "[d]istinctions between citizens solely because of their ancestry are by their

very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 208 (citation omitted).

37.    In sum, these constitutional and statutory standards require that all applicants for assistance in Tennessee—for school admission, government contracts, or, as relevant here, government assistance—receive "an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *5 (N.D. Tex. July 31, 2024) ("*Founders First Cmty.*") (quoting *SFFA*, 600 U.S. at 201-06).

## FACTUAL ALLEGATIONS

### I.    THDA's Discriminatory Homeowner Assistance Fund Program

#### A.    American Rescue Plan Act's Homeowner Assistance Fund

38.    In March 2021, during the COVID-19 Pandemic, Congress enacted the American Rescue Plan Act ("ARPA" or "Act"), which (among other things) established the Homeowner Assistance Fund. *See* Pub. L. No. 117- 2, § 3206, 135 Stat. 4, 63-67 (2021) (codified at 15 U.S.C. § 9058d).

39.    The fund, managed by the U.S. Department of the Treasury ("Treasury"), was designed to "prevent[ ] homeowner mortgage delinquencies, defaults, foreclosures, loss of utilities or home energy services, and displacements of homeowners experiencing financial hardship." 15 U.S.C. § 9058d(c).

40.    Under the Act, the Treasury allocates funds to states "based on homeowner need" within each state, and the states distribute those funds as grants to homeowners who meet the states' requirements. *Id.* § 9058d(d)(2).

41.    The Act delegates authority to the Treasury to administer the overall program for purposes of distributing funds to the states, but it largely leaves states to run their own specific

programs based on their own implementation plans. The Treasury initially released 10% of each

state's eligible funds for states to use in implementing pilot programs. To receive the rest of the

funds, states were required to submit their proposed plans to implement and administer the full

program. When states submitted their plans, they requested a specific amount of funds. The Treas-

ury reviewed the states' plans and provided feedback and recommendations before approving the

plans and distributing the remaining funds. U.S. Dep't of the Treasury, HAF Plans,

https://perma.cc/6JJ4-B42Y ("U.S. Dep't of the Treasury HAF Plans").

### B.  U.S. Department of the Treasury's Guidance and the Definition of Socially Disadvantaged Individuals

42.    The Act requires states to prioritize the distribution of funds to target specific populations of homeowners.

43.    First, the Act specifies that "[n]ot less than 60 percent of" funds shall be used to "assist homeowners having incomes equal to or less than 100 percent of the area median income for their household size or equal to or less than 100 percent of the median income for the United States, . . . whichever is greater." *Id.* § 9058d(c)(2).

44.    Second, states must "prioritize remaining funds to socially disadvantaged individuals." *Id.*

45.    The Act does not define "socially disadvantaged individuals."

46.    In April 2021, the Treasury issued guidance to advise states on how to implement the HAF program. Among other things, the April 2021 guidance provided a recommended definition of socially disadvantaged individual, explicitly defining that term based on race and including a presumption that individuals of particular races are socially disadvantaged:

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the

> following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2 (Apr. 14, 2021) (emphasis omitted), https://perma.cc/YJL8-S9PK.

47.    A few months later, in August 2021, the Treasury issued updated guidance redefining the term "socially disadvantaged individual." The new definition still provided that individuals who were "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society" were socially disadvantaged. The full updated definition is as follows:

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control. Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

*The Homeowner Assistance Fund in the American Rescue Plan Act: In Brief*, Cong. Rsch. Serv. at 8 (Sept. 20, 2021), https://perma.cc/MQ9R-JBEE (quoting U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance*, at 2-3 (Aug. 2, 2021)).

48.     The Treasury has used the same definition of socially disadvantaged individual in subsequent versions of the guidance, including the current version. *See* U.S. Dep't of the Treasury, *Homeowner Assistance Fund Guidance* at 2-3 (June 12, 2023), https://perma.cc/YJV2-PA77.

49.     The Treasury's guidance is not mandatory or binding on the States.

**C.  Tennessee Homeowner Assistance Fund Program**

50.     THDA submitted its initial proposal for implementing its Tennessee Homeowner Assistance Fund plan in August 2021, and after receiving and responding to feedback from the U.S. Treasury, THDA's final proposal was approved in December 2021. THDA was awarded $168,239,035 in HAF funds. U.S. Dep't of the Treasury HAF Plans.

51.     THDA entitled its HAF program the "Tennessee Homeowner Assistance Fund."

52.     THDA's Tennessee Homeowner Assistance Fund program launched in January 2022. THDA, THDA Launches Program to Help COVID-Related Mortgage Delinquencies (Jan. 11, 2022), https://perma.cc/96VJ-MY49.

53.     Under THDA's Tennessee Homeowner Assistance Fund program, homeowners were eligible for up to $40,000 of relief. *Id.* Eligible homeowners could obtain relief in the form of mortgage reinstatement, monthly payment assistance, assistance with past due homeowners' insurance, property taxes, and homeowner association payments, loss mitigation options, other expenses related to a period of forbearance, delinquency, or default, and assistance with partial payments for certain government-backed loans. Plan Narrative at 16-17; THDA, Homeowner's Assistance Fund (June 1, 2023), https://tinyurl.com/2v26xy5x, attached as Exhibit A.[1]

---

[1] Over the course of its Tennessee Homeowner Assistance Fund program, THDA has updated its website, removing information that was previously available. Therefore, archived copies of previous versions of THDA's Tennessee Homeowner Assistance Fund website are linked throughout and attached as exhibits to this Complaint.

54.    THDA's Tennessee Homeowner Assistance Fund program is still open and accepting applications. *See* THDA, Homeowner's Assistance Fund, https://perma.cc/VE75-3UGF. However, applications were closed for mortgage reinstatement and related assistance on August 6, 2023. THDA, Homeowner Assistance Fund (Nov. 29, 2023), https://tinyurl.com/bddjrcb5, attached as Exhibit B. Since August 6, 2023, THDA has only accepted applications for partial claim reimbursement for certain government backed loans. *Id.*

### D. THDA Developed, Marketed, and Administered its Tennessee Homeowner Assistance Fund Program on the Basis of Race

55.    In developing its Tennessee Homeowner Assistance Fund program, THDA chose to adopt the race-based definition of socially disadvantaged individuals offered in non-binding Treasury guidance.

56.    In fact, THDA went further than the Treasury guidance, explicitly defining social disadvantage based on identification as "a minority race or ethnicity." Plan Narrative at 6. Specifically, "[u]sing guidance from procedures set forth at 13 CFR 124.103(c) or (d)," THDA defined "social disadvantage with the following process:"

1) First, if an individual identifies as a member of a minority race or ethnicity, then they are deemed socially disadvantaged.

2) If the individual's race and ethnic status is undetermined, then THDA will check to determine whether the individual accessed language assistance to determine if they are limited in English proficiency. If so, then the individual is deemed socially disadvantaged.

3) If the individual's status is still undetermined, THDA will determine the individual's census tract. If the individual lives in a tract that is majority-minority or has a poverty level of above 20%, the individual may be deemed socially disadvantaged.

4) Finally, if not applicable at the tract-level, then the individual's county of residence is one that has been deemed to have "persistent poverty," then the individual may be deemed socially disadvantaged.

*Id.*

57.     Thus, under THDA's program, "[i]ndividuals that identify as members of the groups" specified in THDA's Plan Narrative document "in their application" are "considered socially disadvantaged." *Id.* These include "American Indian/Alaska Native," "Asian," "Black or African American," "Native Hawaiian/Pacific Islander," and "Hispanic or Latino." *Id.*; *see also id.* at 7 (defining "majority-minority" as "comprised of more than 50% minorities (as measured by individuals who are Black, American Indian, Asian, Native Hawaiian or Pacific Islander, some other race, or two or more races, or Hispanic)"). White homeowners are excluded from THDA's definition of socially disadvantaged individual. *See id.* (defining "Racial composition" for purposes of "[p]roposed tract-level factors of social disadvantaged & statistics in Tennessee" as "all non-White, owner-occupied households"); *id.* at 8 (defining "[m]ajority-minority" in census tracts as "non-white persons compromising more than 50% of the population").

58.     In other words, under THDA's plan, non-white applicants were automatically socially disadvantaged individuals, but white applicants had to meet one of the Treasury definition's other factors (e.g., limited English proficiency, persistent poverty county) and take additional steps to be considered socially disadvantaged.

59.     THDA utilized its race-based definition of socially disadvantaged individuals in deciding how to structure its program, how and where to market and advertise its program, and how to prioritize granting applications and distributing program funds. In doing so, it prioritized homeowners of THDA's preferred races and ethnicities over white homeowners.

60.     In developing its plan, THDA analyzed "data" regarding "mortgage delinquency, forbearances and unemployment" in the state, but it "overlap[ed]" that "information with minority . . . demographics" to get a "a clear picture of those areas of concentration that should reach those populations that may be designated as socially disadvantaged,"—*i.e.*, racial minorities. THDA,

HAFP-0079-Tennessee Treasury Feedback for Resubmission of Plan at 2, https://perma.cc/D3L7-RD4N ("Treasury Feedback"); *see also* Plan Narrative at 4-5 (noting the "% Minority Population" in zip codes with highest forbearance rates). Based on that analysis, THDA "focus[ed]" its "efforts on areas with higher shares of minority populations." Plan Narrative at 5. THDA's "[m]aping [of] these areas of concentration [also] assisted in the development of outreach and marketing efforts" it implemented. Treasury Feedback at 2.

61.     Indeed, in developing its plan, THDA focused on "[q]uantitative data" and "studies" regarding "[m]inority [d]isparities in Tennessee." Plan Narrative at 13-15. These general studies and data regarding racial disparities in the United States—unconnected with THDA's prior actions or the effects of the COVID-19 pandemic's impact on homeowners—informed THDA's planning and development of its Tennessee Homeowner Assistance Fund program. *Id.*

62.     In marketing and advertising its program to inform Tennessee citizens about the availability of funds and how to apply, THDA targeted the agency's preferred racial and ethnic minorities—at the expense of non-minority homeowners—based on its definition of socially disadvantaged individuals. THDA's plan submission indicates that THDA made "public communications" and undertook "community outreach efforts" to market its Tennessee Homeowner Assistance Fund program by partnering "with organizations that primarily target" "member[s] of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society." Tennessee Plan Submission at 10.

63.     In developing its marketing plan, THDA "use[d] the data" it analyzed "to target continued outreach to minority communities," and THDA's "communication department" "work[ed] with the executive staff and the research staff to identify [targeting] priorities" and "then develop[ed] a marketing plan" to target those communities. Plan Narrative at 16. As noted above,

THDA used "minority . . . demographics" to determine "areas of concentration that should reach those populations that may be designated as socially disadvantaged," which informed THDA's "development of outreach and marketing" plans. Treasury Feedback at 2.

64.     To accomplish its race-based targeting-and-marketing plan, THDA "divided its 95 counties into targeting tiers based on demographics that could indicate higher percentages of persons that might need HAF assistance or higher percentages of homeowners that meet the definition of 'socially disadvantaged.'" THDA, *Homeowner Assistance Fund (HAF) Annual Report to Treasury* at 5 (2022), attached as Exhibit C ("2022 Annual Report"); THDA, *Homeowner Assistance Fund (HAF) Annual Report to Treasury* at 6 (2023) ("2023 Annual Report"), attached as Exhibit D (similar). The top "Tier 1 counties" in this marketing plan "saw targeted media such as Spanish print and radio ads" and "ads in African American targeted print." 2022 Annual Report at 5; 2023 Annual Report at 6 (similar).

65.     As a part of its targeted marketing plan, THDA "targeted" its "[o]utreach" "to non-profit and community organizations in different local communities across the state who directly serve [limited English proficiency] populations (Hispanic/Latino, Islamic and Kurdish)." Treasury Feedback at 4. And as a part of THDA's "media outreach plan," the agency "plac[ed] Spanish language content in both paid and earned media (print, radio, TV, minority, digital) in counties of the state where greater than 50% of the population earns 100% of AMI, greater than 10% of homes are owned/occupied by minorities and greater than 5% speak English less than very well." *Id.*

66.     At the start of its program, THDA "initially share[d] advertisement and press release content and media distribution plans with targeted non-profit organizations that serve [limited English proficiency], other minority and socially disadvantaged populations to receive feedback

on creating content and utilizing media that resonates with targeted segments of borrowers." *Id.*
THDA specifically included "[m]inority media outlets" in its "HAF media outreach plan." *Id.*

67.    THDA "monitor[ed]" its targeted marketing plan "closely" and "adjust[ed]" it "as
necessary to ensure that the majority of" marketing was directed "to socially disadvantaged house-
holds"—*i.e.*, racial and ethnic minorities. *Id.* And as its program progressed, THDA "reviewed"
"metrics" "to determine whether additional efforts are needed to reach and serve target popula-
tions" and considered taking actions such as "hiring a marketing partner that specializes in . . .
minority consumer audiences to ensure we are reaching borrowers that have historically been un-
derserved by the conventional market." *Id.*; *see* 2022 Annual Report at 5 (assessing performance
of targeting plan); 2023 Annual Report at 6 (same).

68.    THDA also utilized mortgage servicers to direct outreach about the Tennessee
Homeowner Assistance Fund program to individuals based on race. *See* Tennessee Plan Submis-
sion at 3-4 (THDA "communicate[d] with mortgage servicers regarding the development of its
program design"); Plan Narrative at 29 (THDA worked with "larger national servicers" over
"months"); 2022 Annual Report at 6 (THDA "coordinated with servicers"); 2023 Annual Report
at 7 (same).

69.    THDA's targeted marketing and assistance efforts to homeowners of its preferred
racial and ethnic groups benefited those homeowners at the expense of white homeowners. THDA
specifically informed socially disadvantaged individuals about the program and assisted those in-
dividuals through the application process but did *not* do the same for white homeowners. This
made it more likely that individuals deemed socially disadvantaged based on race would receive
funding—at the expense of white homeowners who were eligible to receive funding but to whom
THDA did not provide the same information or assistance.

70.     In reviewing and granting applications, THDA prioritized (and continues to priori-tize) applications based on race, prioritizing applications submitted by THDA's preferred minority homeowners over white homeowners.

71.     Under its plan, THDA also used its race-based socially disadvantaged individual definition to prioritize assistance: "[A]ny amount not made available to homeowners at or below 100% AMI should be prioritized for individuals who are 'socially disadvantaged.'" Plan Narrative at 6; *see also* THDA, *Homeowner Assistance Fund Program (HAF) Summary Guideline Phase 1* at 2, https://perma.cc/Q9UF-XSVC ("Any amount not made available to homeowners that meet this income-targeting requirement must be prioritized for assistance to socially disadvantaged in-dividuals, with funds remaining after such prioritization being made available for other eligible homeowners."). Upon information and belief, THDA used its race-based socially disadvantaged individual definition to prioritize assistance to homeowners of THDA's preferred racial and ethnic groups over white homeowners at all income levels of applicants.

72.     THDA's prioritization included preference in granting and denying applications and distribution of funds—*i.e.*, applications submitted by minority homeowners were given priority over applications submitted by white homeowners.

73.     THDA's prioritization also included preference in assisting applicants with the ap-plications process, prioritizing application assistance to applicants of THDA's preferred minority racial and ethnic groups over white applicants. *See* Plan Narrative at 17 (discussing assistance for completing applications).

74.     Upon information and belief, THDA required all applicants to select their race in completing and submitting an application. It then used applicants' race to determine whether they should be prioritized for assistance as socially disadvantaged individuals.

75.    THDA also set performance goals to track its progress in granting assistance to homeowners of its preferred racial and ethnic groups. For example, it set goals based on the "[p]ercentage of targeted population households reinstated," Tennessee Plan Submission at 14; 2022 Annual Report at 3, and "[t]argeting vulnerable populations-minority households," Plan Narrative at 28. Moreover, to "determine positive outcomes for the program," it has tracked certain "metrics," including "[a] notable reduction in mortgage burden for homeowners . . . who are deemed 'socially disadvantaged'" and an "Index Measure of [National Median Income ("NMI")] and Social Disadvantage," which includes monitoring the "[p]ercent of applicants and recipients of each racial and ethnic group by NMI." Treasury Feedback at 5.

76.    THDA also monitored the "number of applicants served and percentage of applicants served in targeted populations," the "[n]umber of outreach events in targeted communities," and the "[n]umber of advertising and media opportunities serving targeted populations." Plan Narrative at 28. THDA "closely" monitored this information so that it could "adjust marketing and guidelines as necessary to ensure that the majority of those [assisted above the national median income] are . . . socially disadvantaged households." Feedback at 4.

77.    In its 2022 and 2023 annual reports to the U.S. Department of the Treasury, THDA touted the fact that over half of the "homeowners who have received funds meet the definition of 'socially disadvantaged.'" 2022 Annual Report at 5; 2023 Annual report at 6.

78.    THDA's use of a race-based definition of socially disadvantaged individuals is reflected in the demographics of its application statistics. Out of the approved applications, *46% of the homeowners were black and 51% were white,* Dep't of the U.S. Treasury, Approved Application Disaggregated Demographics by Participant, Homeowner Assistance Fund Quarterly Data Through Q2, 2024, https://perma.cc/Y6HR-Z3KE, *despite the fact that 16.5% of Tennessee*

*citizens are black and 78.4% are white*, U.S. Census Bureau, Quick Facts: Tennessee, https://ti-nyurl.com/bdvz244p. This dramatic difference cannot be explained by income disparities or other race-independent reasons. For example, comparing census and poverty rate data, about 29.1% of Tennessee citizens below the poverty line are black and 69.2% are white. *See id.*; KFF, State Health Facts: Poverty Rate by Race/Ethnicity (2022), https://perma.cc/PQD3-DMVA.

## II.    Effect of THDA's Racial Discrimination on Plaintiffs

79.    Because of THDA's race-based implementation of its Tennessee Homeowner Assistance Fund program, Plaintiffs were deprived of the opportunity to learn about the program and apply for assistance, were deterred from applying for assistance, or were denied assistance after applying because of their race.

### A.  Plaintiff Christian Robbins

80.    Plaintiff Christian Robbins is a resident of Tennessee.

81.    Plaintiff Robbins is white.

82.    Plaintiff Robbins owns a home in Weakley County, Tennessee, and has a mortgage on the home.

83.    Prior to the COVID-19 pandemic, Plaintiff Robbins worked part time at his parents' restaurants.

84.    After the COVID-19 pandemic began, those restaurants were closed or not operating at full capacity due to the pandemic. As a result, Plaintiff Robbins experienced a significant decrease in income.

85.    Plaintiff Robbins was also infected with COVID-19 twice, and both times he was forced to miss work and lost pay.

86.     Plaintiff Robbins also worked part time on contracting jobs for his father. But after his father passed away from an infection with COVID-19, he was unable to continue those contracting jobs, causing him to have a significant decrease in income.

87.     Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Robbins struggled to pay his bills, including his mortgage.

88.     Plaintiff Robbins was delinquent on his mortgage for one or more months between 2022 and 2023. Plaintiff Robbins continues to struggle to pay his mortgage as a result of his financial hardships related to the COVID-19 pandemic.

89.     Due to THDA's discriminatory targeting, marketing, and outreach regarding its Tennessee Homeowner Assistance Fund program, Plaintiff Robbins never heard about the program.

90.     Because Plaintiff Robbins never heard about the program as a result of THDA's discriminatory targeting, marketing, and outreach, he was unable to apply for and obtain financial assistance for which he plainly qualified—including assistance related to his delinquent mortgage payments—before the program closed to new applications for most forms of mortgage assistance in August 2023.

91.     Although THDA is still operating its race-based Tennessee Homeowner Assistance Fund program, Plaintiff Robbins is prohibited from applying for relief because of how the program has prioritized and organized assistance along racial lines.

92.     Therefore, Plaintiff Robbins was harmed and continues to be harmed by THDA's discrimination.

93.      Plaintiff Robbins was and still is ready and able to apply for relief through THDA's Tennessee Homeowner Assistance Fund program.

94.    Had Plaintiff Robbins been informed about the program by THDA, he would have applied for and been eligible for assistance, including mortgage-reinstatement assistance. Were the program to be reopened on a race-neutral basis, Plaintiff Robbins would apply for and would be eligible for assistance, including reinstatement assistance. If THDA had not discriminated on the basis of race in administering the program, Plaintiff Robbins would have received much needed COVID-19 relief.

**B.  Plaintiffs Greg and Eva Noyes**

95.    Plaintiffs Greg and Eva Noyes are residents of Tennessee.

96.    Plaintiffs Greg and Eva Noyes are white.

97.    Plaintiffs Greg and Eva Noyes own a home in Henry County, Tennessee, and have a mortgage on the home.

98.    In the wake of the COVID-19 pandemic, Plaintiff Greg Noyes's hours were cut at the cabinet-manufacturing factory where he worked. As a result, Greg and Eva Noyes experienced a significant decrease in income.

99.    Due to this financial hardship related to the COVID-19 pandemic, Plaintiffs Greg and Eva Noyes struggled to pay their bills, including their mortgage.

100.    Plaintiffs Greg and Eva Noyes were delinquent on their mortgage for one or more months between 2022 and 2023.

101.    Plaintiffs Greg and Eva Noyes were eligible for financial assistance through THDA's Tennessee Homeowner Assistance Fund program because they met its income limits and other requirements.

102.    After the Tennessee Homeowner Assistance Program opened, Plaintiff Eva Noyes called THDA to inquire about assistance under the program.

103.    THDA asked her for multiple pieces of information over the phone, including her race and ethnicity.

104.    Despite Plaintiffs Greg and Eva Noyes being delinquent on their mortgage and eligible for the program, THDA informed Plaintiff Eva Noyes that she and Greg were not qualified. THDA did not explain why.

105.    Upon information and belief, THDA's denial of assistance to Plaintiffs Greg and Eva Noyes was due to THDA's race-based criteria, including its prioritization of applications and distribution of funds.

106.    Plaintiffs Greg and Eva Noyes were and still are ready and able to apply for assistance under THDA's Tennessee Homeowner Assistance Fund.

107.    Upon information and belief, Plaintiffs Greg and Eva Noyes would have received financial assistance had THDA not discriminated based on race.

108.    Because Plaintiffs Greg and Eva Noyes were denied or deterred from submitting an application, they were unable to obtain financial assistance for their mortgage, including assistance related to their delinquent mortgage payments.

109.    Therefore, Plaintiffs Greg and Eva Noyes were harmed and continue to be harmed by THDA's discrimination.

**C.  Plaintiff Shana Smith**

110.    Plaintiff Shana Smith is a resident of Tennessee.

111.    Plaintiff Shana Smith is white.

112.    Plaintiff Shana Smith owns a home in Weakley County, Tennessee, and has a mortgage on the home.

113.    In the wake of the COVID-19 pandemic, Shana Smith suffered a financial hardship. Her son who lives with her and provides income for their family had his hours cut at his farm store job because of the pandemic. Shana also had difficulty finding work due to the pandemic.

114.    Due to these financial hardships related to the COVID-19 pandemic, Plaintiff Smith struggled to pay her bills, including her mortgage.

115.    Plaintiff Smith was delinquent on her mortgage for one or more months between 2022 and 2023.

116.    Plaintiff Shana Smith was eligible for financial assistance through THDA's Tennessee Homeowner Assistance Fund program because she met its income limits and other requirements.

117.    After the Tennessee Homeowner Assistance Program opened, Plaintiff Shana Smith applied to the program. During the application process, Plaintiff Shana Smith provided all materials requested by THDA.

118.    Despite Plaintiff Smith being delinquent on her mortgage and eligible for the program, THDA denied Plaintiff Smith's application.

119.    Upon information and belief, THDA's denial of assistance to Plaintiff Smith was due to THDA's race-based criteria, including its prioritization of applications and distribution of funds.

120.    Plaintiff Smith was and still is ready and able to apply for assistance under THDA's Tennessee Homeowner Assistance Fund.

121.    Upon information and belief, Plaintiff Smith would have received financial assistance had THDA not discriminated based on race.

122.    Because Plaintiff Smith's application was denied, she was unable to obtain financial assistance for her mortgage, including assistance related to their delinquent mortgage payments.

123.    Therefore, Plaintiff Smith was harmed and continues to be harmed by THDA's discrimination.

## CLASS ALLEGATIONS

124.    Plaintiffs bring this action on behalf of themselves, and other Tennessee homeowners similarly entitled to relief.

125.    The Class here consists of:

a.    All Tennessee homeowners who applied for assistance or attempted to apply for assistance under THDA's Tennessee Homeowner Assistance Fund program, who are white, who were otherwise eligible for funds under the program but did not meet THDA's definition of socially disadvantaged individual, and who had their applications denied, who had their applications delayed in processing, or were deterred from applying by THDA because of THDA's race-based prioritizing of applications.

b.    All Tennessee homeowners who are white, who were otherwise eligible for funds under THDA's Tennessee Homeowner Assistance Fund program but did not meet THDA's definition of socially disadvantaged individual, and who never learned about the program because of THDA's race-based marketing and outreach.

126.    Class members are seeking damages from THDA under Title VI for unlawful discrimination in the development, marketing, and administration of the Tennessee Homeowner Assistance Fund program.

127.    Class members are also seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Tennessee Homeowner Assistance Fund program unlawful and requiring THDA to stop administering the program in a racially discriminatory manner.

128.    In the alternative, Class members are seeking declaratory and injunctive relief under Title VI and the Equal Protection Clause of the Fourteenth Amendment declaring the use of race in the Tennessee Homeowner Assistance Fund program unlawful, requiring THDA to stop administering the program in a racially discriminatory manner, and requiring THDA to reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis.

129.    The Class shall exclude any judicial officers presiding over this action, as well as members of their immediate families and members of their judicial staffs. The Class shall also exclude any attorney appearing in this action and any juror assigned to this action, as well as members of their immediate families.

130.    The proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). The exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery. But given the number of homeowners in Tennessee and the thousands of homeowners who applied for the Tennessee Homeowner Assistance Fund program, there are at least thousands of members of the proposed Class.

131.    Common questions of law and fact exist with respect to the Class. *See* Fed. R. Civ. P. 23(a)(2). Those questions include:

a.     Whether THDA defined and applied its "socially disadvantaged individual" criterion in a racially discriminatory manner;

b.     Whether THDA intentionally targeted non-white homeowners in its Tennessee Homeowner Assistance Fund marketing;

c.     Whether THDA intentionally prioritized non-white homeowners in its review of Tennessee Homeowner Assistance Fund applications;

d.     Whether THDA discriminated against Class members on the basis of their race;

e.     Whether THDA's challenged conduct violates Title VI; and

f.     Whether THDA's challenged conduct violates the Equal Protection Clause.

132.    Plaintiffs' claims are typical of those of the other Class members. *See* Fed. R. Civ. P. 23(a)(3). All members of the Class are Tennessee homeowners, who were eligible for funds under the Tennessee Homeowner Assistance Fund program, are white and otherwise did not meet THDA's definition of socially disadvantaged individuals, and who either (i) applied for the program and were denied funds, had the processing of their application delayed, or were deterred from applying or (ii) never learned of the program in the first place because of their race. They were therefore similarly affected by THDA's wrongful conduct complained of herein.

133.    Plaintiffs will fairly and adequately protect the interests of all Class members. *See* Fed. R. Civ. P. 23(a)(4). Plaintiffs' counsel is competent and experienced in litigating complex cases involving class actions and litigating federal Constitutional and statutory rights. Plaintiffs have no interests adverse or antagonistic to the Class.

134.    The Class is certifiable under Federal Rule of Civil Procedure 23(b)(3). The common questions of law and fact listed above predominate over any questions affecting only

individual members of the Class. All Class members are entitled to similarly race-blind development, marketing, and implementation of state housing assistance programs distributing federal funds. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. The membership of the Class can be readily ascertained from analysis of records in the possession of Defendants, mortgage-servicer information, and publicly available data. Class-wide damages can also be readily calculated based on the information available in THDA's Tennessee Homeowner Assistance Fun program. Prosecution as a class action will eliminate the possibility of unnecessary, repetitive litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who otherwise could not bear the expense and burden of seeking redress on an individual basis for the conduct alleged herein, particularly given that the Class involves homeowners in need of mortgage assistance in the wake of the COVID-19 pandemic.

135.    The Class is also certifiable under Federal Rule of Civil Procedure 23(b)(2). *See Miller v. Vilsack*, 2021 WL 11115194, at *8 (N.D. Tex. July 1, 2021) (certifying 23(b)(2) class in challenge to USDA's distribution of loan forgiveness to "socially disadvantaged" applicants). THDA has discriminated and continues to discriminate on grounds that apply generally to the Class—namely, prioritizing applications and marketing the Tennessee Homeowner Assistance Fund program based on race. Therefore, declaratory and injunctive relief declaring that THDA's development, marketing, and implementation of its Tennessee Homeowner Assistance Fund program is unlawful and requiring THDA to stop administering the program in a racially discriminatory manner in the distribution of any remaining funds, or, in the alternative, to reopen the program

to all forms of mortgage assistance, market the program on a race-neutral basis, consider previ-ously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis is appropriate respecting the Class as a whole.

## CLAIMS

### COUNT I
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN PRIORITIZATION OF APPLICATIONS

136.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

137.    **Federal law prohibits discrimination on the basis of race.** Title VI of the Civil Rights Act of 1964 provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be sub-jected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

138.    This provision of Title VI may be enforced through suits by private individuals for damages and injunctive relief. *See*, *e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

139.    "To state a claim for damages under [Title VI], a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal assistance." *Grimes v. Superior Home Health Care of Middle Tenn., Inc.*, 929 F. Supp. 1088, 1092 (M.D. Tenn. 1996) (citation omitted).

140.    Intentional race discrimination can take the form of a policy that is discriminatory on its face or a facially neutral policy that was adopted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 562 (3rd Cir. 2002) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

141.    "Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin" because "Title VI bears independent force beyond the

Equal Protection Clause." *SFFA*, 600 U.S. at 309-10 (Gorsuch, J., concurring); *see Founders First Cmty.*, 2024 WL 3625684 at *3-4 (holding that plaintiff's discrimination claim pursuant to 42 U.S.C. § 1981 likely to succeed on the merits because program "discriminates against applicants . . . based on race").

142.    But at a minimum, Title VI is coextensive with the protections of the Equal Protection Clause. U.S. Const. amend. XIV, § 1. ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Therefore, "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *SFFA*, 600 U.S. at 198 n.2 (citation omitted); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause.").

143.    **Racial classifications are subject to strict scrutiny.** Under both Title VI and the Equal Protection Clause, racial classifications are subject to strict scrutiny. "[W]hen the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Therefore, state agencies may not provide a benefit, such as distribution of funds, on the basis of race without satisfying strict scrutiny.

144.    Under strict scrutiny, the government must show that its racial classification "further[s] compelling governmental interests." *SFFA*, 600 U.S. at 206-07 (citation omitted). Remedying "societal discrimination," however, is never a compelling interest because "[s]uch an interest presents 'an amorphous concept of injury that may be ageless in its reach into the past.'" *Id.* at 226 (citation omitted). Thus, generalized claims of remedying past "societal discrimination" "cannot 'justify a [racial] classification that imposes disadvantages upon persons . . . who bear no

responsibility for whatever harm the beneficiaries" of the race-based government "program are thought to have suffered." *Id.* (citation omitted). Moreover, a "generalized assertion" of "past discrimination" is not a compelling interest because it "provides no guidance for [the government] to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989).

145.    Rather, for the government to have a compelling interest in remedying past discrimination, (1) "the policy must target a specific episode of past discrimination," (2) "there must be evidence of *intentional* discrimination in the past," and (3) "the government must have had a hand in the past discrimination it now seeks to remedy." *Vitolo*, 999 F.3d at 361 (citing *J.A. Croson Co.*, 488 U.S. at 492, 498, 503).

146.    If the government can show that a racial classification somehow serves a compelling interest, it then must show that its classification is "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 207; *Holman v. Vilsack*, No. 21-1085-STA-JAY, 2021 WL 2877915, at *5 (W.D. Tenn. July 8, 2021). To be narrowly tailored, a racial classification must be "sufficiently focused" on obtaining "measurable objectives warranting the use of race." *SFFA*, 600 U.S. at 230. This means that it must be targeted—*i.e.*, it cannot be over- or under-inclusive. *See id.* at 216; *see also Vitolo*, 999 F.3d at 361-62. Moreover, "race may never be used as a 'negative' and . . . may not operate as a stereotype." *SFFA*, 600 U.S. at 218. Finally, a court may not uphold a race-based policy unless it is "satisfied that no workable race-neutral alternatives would" achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

147.    **THDA's Use of Race in Prioritizing Applications Fails Strict Scrutiny.** THDA received federal financial assistance from the HAF program and intentionally used those federal

funds to prioritize granting applications and distributing funds to homeowners in preferred racial and ethnic groups over white homeowners through its Tennessee Homeowner Assistance Fund program.

148.    THDA used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and prioritized applications submitted by those "socially disadvantaged individuals" over white homeowners.

149.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364 (holding that Small Business Administration's (SBA) distribution of Restaurant Revitalization Funds and prioritization of "socially disadvantaged" applicants based on race failed strict scrutiny); *Holman*, 2021 WL 2877915, at *13-14 (holding that USDA's use distribution of loan forgiveness to "socially disadvantaged" applicants based on race failed strict scrutiny); *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1294 (M.D. Fla. 2021) (same); *Faust v. Vilsack*, 519 F. Supp. 3d 470, 478 (E.D. Wis. 2021) (same); *Ultima Servs. Corp. v. U.S. Dep't of Agric.*, 683 F. Supp. 3d 745, 774 (E.D. Tenn. 2023) (holding that USDA's and SBA's preferential awarding of government contracts to "socially disadvantaged individuals" based on race failed strict scrutiny); *Nuziard v. Minority Bus. Dev. Agency*, 2024 WL 965299, at *40 (N.D. Tex. Mar. 5, 2024) (holding that Minority Business Development Agency's distribution of financial assistance to "socially disadvantaged" applicants based on race failed strict scrutiny); *Strickland v. U.S. Dep't of Agric.*, 2024 WL 2886574, at *9 (N.D. Tex. June 7, 2024) (holding that USDA's Emergency Relief Program's distribution of more relief funds to "socially disadvantaged farmers" than white farmers failed strict scrutiny).

150.    Indeed, courts have already held that prioritizing government aid to "socially disadvantaged individuals" based on the definitions in 13 CFR § 124.103—the regulation THDA relied on in developing its own socially disadvantaged individual definition, Plan Narrative at 6—is unconstitutional. *See Vitolo*, 999 F.3d at 364; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774.

151.    And courts have recently held other race-based application programs to be unlawful under similar civil rights statutes. *See Fearless Fund Mgmt.*, 103 F.4th at 769, 777 (holding that private grant contest "open only to businesses owned by black women" unlawfully discriminated on the basis of race in violation of 42 U.S.C. § 1981); *Founders First Cmty.*, 2024 WL 3625684, at *3-4 (holding that private small business grant program that required "applicants [to] identify as . . . Latinx, Black, Asian, Women, LGBTQIA+, a Military Veteran, or someone located in a Low or Moderate income area" unlawfully discriminated "based on race" in violation of 42 U.S.C. § 1981).

152.    Because THDA's Tennessee Homeowner Assistance Fund program prioritized applications based on race, strict scrutiny applies.

153.    THDA's race-based prioritization scheme for reviewing and granting applications through its Tennessee Homeowner Assistance Fund program fails to satisfy strict scrutiny.

154.    THDA's use of race in prioritizing applications to socially disadvantaged individuals does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination against a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

155.    Moreover, THDA's use of race to prioritize socially disadvantaged individuals over white homeowners does not remediate any specific, identified instances of past discrimination.

Rather, the Tennessee Homeowner Assistance Fund program is based on a generalized notion of remedying past societal discrimination for homeowners of its preferred racial and ethnic groups, declaring homeowners socially disadvantaged individuals if they are "member[s] of a minority race or ethnicity." Plan Narrative at 6. In other words, the program is not targeted toward some specific episode of past, intentional discrimination that the THDA participated in.

156.    Even if THDA could show a compelling interest in its race-based Tennessee Home-owner Assistance Fund program, the program is not narrowly tailored.

157.    *First*, THDA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without prioritizing applications according to a race-based definition of socially disadvantaged individuals.

158.    For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and prioritized applications from those homeowners. Tex. Dep't of Hous. and Cmty. Aff., Texas Homeowner Assistance Fund (HAF) at 11-12 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK ("Texas HAF Plan").

159.    California, too, used race-neutral criteria to prioritize aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and prioritized applications from those homeowners. Cal. Hous. Fin. Agency, California Homeowner Assistance Fund Plan at 10-11 (Dec. 9, 2021), https://perma.cc/7HVK-GP3H ("California HAF Plan"). As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area

Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." Office of Policy Development and Research (PD&R), Qualified Census Tracts and Difficult Development Areas, HUD User, https://perma.cc/X3TD-R6VV ("HUD, Qualified Census Tracts and Difficult Development Areas"). As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA Ctr. for Neighborhood Knowledge, California COVID-19 Owner Vulnerability, https://perma.cc/PT48-LY56 ("UCLA, California COVID-19 Owner Vulnerability").

160.    THDA could have also defined socially disadvantaged individual status based on race-neutral factors such as geographic location, family size, risk of eviction, mortgage debt, or countless others and used those factors to prioritize applications. Indeed, under THDA's tiered socially disadvantaged definition, it could have simply used the last race-neutral factor for all applicants—"the individual's county of residence is one that has been deemed to have 'persistent poverty." Plan Narrative at 6.  "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

161.    *Second*, THDA's prioritizing applications for socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that THDA's preferred minority homeowners are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. And in the context of distributing federal benefits, "[a] benefit provided to some applicants but not to others necessarily advantages

36

the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. THDA's program has "finite resources," which means that any prioritization makes a big difference—applicants who qualify as socially disadvantaged individuals based on their race have earlier and easier access to funds than applicants who do not meet the racial criteria while applicants at the back of the line risk having crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuzi-ard*, 2024 WL 965299 at *36 ("[T]he fact that the latter applicants have a backdoor to benefits doesn't change the initial disadvantage conferred by the stereotype."); *see SFFA*, 600 U.S. at 219 ("How else but 'negative' can race be described if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?").

162.    *Third*, THDA's Tennessee Homeowner Assistance program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by prioritizing homeowners' applications based on race—prioritizing a minority applicant who lost his job due to supply-chain issues caused by the COVID-19 pandemic and has trouble making mortgage payments due to the loss of income has nothing to do with remediating past discrimina-tion. In any event, the program is underinclusive—the program excludes both minority homeown-ers who do not fall within its income limits and those white homeowners who have experienced discrimination. The program is also underinclusive in that it prioritizes assistance to certain pre-ferred minority racial and ethnic groups, Plan Narrative at 6, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. THDA's program is also overinclusive—it prioritizes applications submitted by non-white homeowners regardless of whether those homeowners or their specific racial group have experienced housing discrimination.

163.    Because THDA's intentional use of race in prioritizing applications as a part of its Tennessee Homeowner Assistance Fund program fails strict scrutiny, THDA's actions violate the Equal Protection Clause and Title VI.

164.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of THDA's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all THDA funds that they have been wrongfully deprived of because of their race.

165.    Plaintiffs and other Class members are also entitled to nominal damages for THDA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

166.    Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance program violates Title VI and the Equal Protection Clause and requiring THDA to stop administering the program in a racially discriminatory manner.

167.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring THDA to reopen the program to all forms of mortgage assistance and reconsider denied applications on a race-neutral basis.

168.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

### COUNT II
### 42 U.S.C. § 2000d & 42 U.S.C. § 1983
### RACIAL DISCRIMINATION IN MARKETING AND OUTREACH

169.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

170.    THDA received federal financial assistance from the federal HAF program and intentionally used those federal funds to market its Tennessee Homeowner Assistance Fund program to state-preferred minority homeowners at the expense of white homeowners.

171.    THDA used the term "socially disadvantaged individual" as a proxy for non-white homeowners, and it developed and implemented an outreach and marketing program to advertise its Tennessee Homeowner Assistance Fund program to THDA's preferred racial and ethnic groups. White homeowners were not targeted for outreach or marketing as part of THDA's marketing plan.

172.    Many eligible white homeowners—like Plaintiff Robbins—thus had no idea they could obtain the significant financial assistance the Tennessee Homeowner Assistance program offered. Had eligible white homeowners like Plaintiff Robbins known about the program, they would have applied and obtained substantial financial assistance.

173.    Courts have routinely applied strict scrutiny to government programs that discriminate on the basis of race in the distribution of government benefits under the guise of the term "socially disadvantaged individuals." *See, e.g., Vitolo*, 999 F.3d at 364; *Holman*, 2021 WL 2877915, at *13-14; *Wynn*, 545 F. Supp. 3d at 1294; *Faust*, 519 F. Supp. 3d at 478; *Nuziard*, 2024 WL 965299 at *40; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774; *Strickland v*, 2024 WL 2886574, at *9; *cf. Fearless Fund Mgmt.*, 103 F.4th at 769, 777; *Founders First Cmty.*, 2024 WL 3625684, at *3-4.

174.    Indeed, courts have already held that prioritizing government aid to "socially disadvantaged individuals" based on the definitions in 13 CFR § 124.103—the regulation THDA relied on in developing its own socially disadvantaged individual definition, Plan Narrative at 6—is unconstitutional. *See Vitolo*, 999 F.3d at 364; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 774.

175.    Because THDA's Tennessee Homeowner Assistance fund program chose to market and conduct other outreach efforts to homeowners based on race, strict scrutiny applies.

176.   THDA's race-based marketing plan for advertising and informing homeowners about its Tennessee Homeowner Assistance program fails to satisfy strict scrutiny.

177.   THDA's use of race in deciding how and to whom to market its program does not further a compelling government interest. Congress created the HAF program to assist homeowners who had been financially impacted by the COVID-19 pandemic, not to remedy some specific, identifiable past form of discrimination to a particular racial group. Indeed, the COVID-19 pandemic affected homeowners of all races.

178.   Moreover, THDA's use of race to market its program to homeowners in preferred racial and ethnic groups over white homeowners does not remediate any specific, identified instances of past discrimination.

179.   Even if THDA could show a compelling interest in its race-based Tennessee Homeowner Assistance Fund program, the program is not narrowly tailored.

180.   *First*, THDA failed to consider race-neutral alternatives. Other states were able to implement their HAF programs without marketing their programs to specific racial minority groups rather than to all eligible homeowners.

181.   For example, Texas used race-neutral criteria to determine which homeowners are socially disadvantaged. Texas defined homeowners as socially disadvantaged if they resided in a persistent poverty county and targeted marketing and outreach to those homeowners. Texas HAF Plan at 11 (Jan. 27, 2022), https://perma.cc/2QU3-2TEK.

182.   California, too, used race-neutral criteria to target outreach about aid. California "define[d] socially disadvantaged homeowners as Californians that live in Qualified Census Tracts (QCT) or areas with 'high' and 'highest' vulnerability values on the Owner Vulnerability Index (OVI), developed by the UCLA Center for Neighborhood Knowledge" and targeted marketing and

outreach to those homeowners. California HAF Plan at 11. As defined by the U.S. Department of Housing and Urban Development, "Low-Income Housing Tax Credit Qualified Census Tracts must have 50 percent of households with incomes below 60 percent of the Area Median Gross Income (AMGI) or have a poverty rate of 25 percent or more." HUD, Qualified Census Tracts and Difficult Development Areas. As defined by UCLA's Center for Neighborhood Knowledge, the "Owner Vulnerability Index" "utilizes four dimensions to identify vulnerability, which are Neighborhoods: 1) With a disproportionately large number of homeowners potentially on the edge of financial vulnerability due to high housing cost burden; 2) With a disproportionately large number of households with little income after deducting housing costs; 3) With many mortgages with relatively high interest rates; and 4) With high foreclosure rates during the previous foreclosure crisis (Great Recession)." UCLA, California COVID-19 Owner Vulnerability.

183.    THDA could have marketed its program equally across the state, ensuring that all eligible homeowners had equal opportunity to learn about the available financial assistance. THDA also could have targeted its marketing to specific areas or specific homeowners based on race-neutral factors like income, poverty level, family size, eviction rates, mortgage delinquencies, etc. Indeed, under THDA's tiered socially disadvantaged individual definition, it could have marketed only to homeowners whose "county of residence is one that has been deemed to have 'persistent poverty.'" Plan Narrative at 6. "Because these race-neutral alternatives exist, the government's use of race is unconstitutional." *Vitolo*, 999 F.3d at 363.

184.    *Second*, THDA's marketing to socially disadvantaged homeowners based on race uses race as a "negative" and is based on "stereotypes" that minority homeowners are disadvantaged while white homeowners are not, regardless of the financial impact they experienced related to the COVID-19 pandemic. In other words, THDA decided it was more important that

homeowners of certain preferred racial groups hear about the program rather than homeowners who are members of disfavored races. And in the context of marketing a program that distributes federal benefits, marketing to some homeowners but not others "necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19. THDA's program had "finite resources," which means that marketing matters—homeowners deemed socially disadvantaged individuals based on their race have earlier and easier opportunity to learn about the program (and apply for funds) than homeowners who do not meet the racial criteria and applicants who do not hear about the program (or hear about it too late) risk having these crucial funds delayed or obtaining no relief at all when the funds are exhausted. *Nuziard*, 2024 WL 965299, at *36; *see SFFA*, 600 U.S. at 219.

185.    *Third*, THDA's Tennessee Homeowner Assistance Fund program is not targeted toward any compelling interest. Any purported interest in remedying past discrimination is not furthered by marketing the program to certain homeowners but not others based on race. For one, it is underinclusive—the program excludes minority homeowners who do not fall within its income limits and white homeowners who do fall within its income limits even if those white homeowners experienced discrimination. And to the extent THDA marketed to certain geographic areas but not others based on race, that too is underinclusive because it ignores minority homeowners in other non-targeted geographic areas. The program is also underinclusive in that it prioritized marketing to certain preferred minority racial and ethnic groups, Plan Narrative at 6, but it is not clear if those groups include other minorities who have experienced discrimination such as Jews, Arabs, and others. *See Vitolo*, 999 F.3d at 363; *Ultima Servs. Corp.*, 683 F. Supp. 3d at 772. It is also overinclusive—it markets the program to homeowners based on race, regardless of whether those

homeowners or their specific racial group experienced housing discrimination and regardless of whether the homeowners are eligible for benefits under the program.

186.    Because THDA's intentional use of race in marketing its Tennessee Homeowner Assistance program fails strict scrutiny, THDA's actions violate the Equal Protection Clause and Title VI.

187.    Plaintiffs and other Class members have suffered damages as a direct and proximate result of THDA's violations of Title VI. Therefore, Plaintiffs are entitled to substantial compensatory damages, to be measured at trial, for any and all THDA funds that they have been wrongfully deprived of because of their race.

188.    Plaintiffs and other Class members are also entitled to nominal damages for THDA's completed violation of their legal rights under the Equal Protection Clause and Title VI.

189.    Plaintiffs and other Class members are also entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring THDA to stop administering the program in a racially discriminatory manner.

190.    In the alternative, Plaintiffs and other Class members are entitled to declaratory and injunctive relief, declaring that THDA's Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and requiring THDA to reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, and consider new applications on a race-neutral basis.

191.    Plaintiffs are also entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

Plaintiffs request relief and judgment as follows:

a. Certify that this action is a proper class action under Federal Rule of Civil Procedure 23(a) and (b) on behalf of the Class defined herein;

b. Award Plaintiffs and the Class members compensatory damages for Defendants' violation of Title VI, in an amount to be proven at trial, including interest thereon;

c. Award Plaintiffs and the Class members nominal damages for Defendants' completed violation of Title VI and the Equal Protection Clause;

d. Declare that Defendants' racially discriminatory development, marketing, and administration of the Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner.

e. Alternatively, declare that Defendants' racially discriminatory development, marketing, and administration of its Tennessee Homeowner Assistance Fund program violates Title VI and the Equal Protection Clause and enter an injunction requiring Defendants to stop administering the program in a racially discriminatory manner, reopen the program to all forms of mortgage assistance, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis;

f. Enter judgment in favor of Plaintiffs and the Class members;

g. Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988; and

h. Order such further relief as the Court may deem proper and just.

Dated: October 25, 2024

Respectfully submitted,

*s/ Jared B. Magnuson*
_____

Jonathan F. Cohn*
2972578 (NY)
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
jon@lkcfirm.com

Jared B. Magnuson*
131189 (GA)
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

William T. Thompson*
24088531 (TX)
Matthew H. Frederick*
24040931 (TX)
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
will@lkcfirm.com
matt@lkcfirm.com

Mark M. Rothrock*
56747 (NC)
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615
(336) 416-3326
mark@lkcfirm.com

*Pro Hac Vice Applications Forthcoming*

*Attorneys for Plaintiffs*